# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE



**FILED**

**February 1, 1999**

**Cecil W. Crowson**
**Appellate Court Clerk**

STATE OF TENNESSEE, ex rel.,    )
KIMBERLY NORFLEET,    )
    )    Davidson Circuit
    Plaintiff/Appellant,    )    No. 95D-996
    )
VS.    )    Appeal No.
    )    01A01-9805-CV-00228
TOMMY DOBBS, JR.,    )
    )
    Defendant/Appellee.    )

APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE MURIEL ROBINSON, JUDGE

For Plaintiff/Appellant:

John Knox Walkup
Attorney General and Reporter

Tammy L. Kennedy
Assistant Attorney General

For Defendant/Appellee:

No appearance

## AFFIRMED AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# O P I N I O N

This appeal involves a parent's efforts to avoid paying child support for her two children. Approximately two years after the Circuit Court for Davidson County awarded custody of the parties' two children to their father, the children's mother, with the assistance of a lawyer furnished by the IV-D contractor for Davidson County, filed a petition to eliminate her child support obligation because she was unemployed and her only income was Supplemental Security Income ("SSI") payments. Following a bench trial, the trial court denied the mother's petition on the ground that she was voluntarily unemployed. The mother asserts on this appeal that the trial court's order conflicts with the child support guidelines because she will be required to use her SSI payments to pay her child support. We have determined that the evidence does not preponderate against the trial court's finding that the mother is voluntarily unemployed and that the trial court's order is consistent with the child support guidelines. Therefore, we affirm the trial court.

## I.

Tommy Dale Dobbs, Jr. and Kimberly Ann Norfleet were married on March 19, 1993. On October 11, 1993, Ms. Norfleet gave birth to Austin Dale Dobbs and Ashley Nicole Dobbs. Marital problems eventually caused the parties to separate. On June 12, 1995, Mr. Dobbs and Ms. Norfleet signed a marital dissolution agreement in which they agreed that Mr. Dobbs was entitled to an irreconcilable differences divorce, that he should have sole custody of the children, and that Ms. Norfleet would pay $57.75 per week in child support[1] and would also provide medical and hospitalization insurance for the children. Following a hearing on July 25, 1995, the trial court entered a final judgment of divorce on August 24, 1995, granting Mr. Dobbs an irreconcilable differences divorce and approving the marital dissolution agreement.

Ms. Norfleet has apparently been unemployed since 1995. In mid-1996, she sought unsuccessfully to reduce her child support obligation. In October 1996, she applied for SSI benefits under Title XVI of the Social Security Act and on February

---

[1]This amount included $55 in child support and $2.75 representing the circuit court clerk's five percent commission because Ms. Norfleet was required to pay her child support through the clerk's office in accordance with Tenn. Code Ann. § 36-5-101(a)(4)(A) (Supp. 1998).

10, 1997 received word that she was entitled to receive $322.67 per month. The letter informing her of her benefits stated that "[t]he doctors and other trained personnel who decided that you are disabled believe that your health may improve.[2] Therefore, we will review your case in about 3 years." It also informed her that she could work and still receive SSI payments.[3] On February 27, 1997, the Social Security Administration informed Ms. Norfleet that her SSI payments were being increased to $484 per month.

At about the same time, Ms. Norfleet requested the IV-D contractor for Davidson County for assistance in seeking a reduction of her child support obligation. On April 25, 1997, a lawyer furnished by the IV-D contractor filed a petition on Ms. Norfleet's behalf seeking to decrease her child support "due to petitioner [sic] only source of income being social security benefits." During a May 22, 1997 hearing, Ms. Norfleet testified that she was currently living with her boyfriend and that she was borrowing money from her mother to make her child support payments. Accordingly, on June 24, 1997, the trial court entered an order dismissing Ms. Norfleet's petition and granting Mr. Dobbs a $1,515 judgment for the child support arrearage.[4] Following this hearing, Ms. Norfleet was obligated to continue to pay $57.75 per week in child support and $10.50 per week to reduce the arrearage.

On November 3, 1997, Ms. Norfleet, with the assistance of the lawyer furnished by the IV-D contractor, filed a third petition to decrease her child support. She again asserted that she was unemployed and was receiving SSI disability payments and also claimed that she was no longer living with her boyfriend and that her mother had stopped loaning her money to pay her child support. During a November 20, 1997 hearing, Ms. Norfleet testified that she had recently been arrested

---

[2]The nature of Ms. Norfleet's disability is not clear. In response to the trial court's questioning, she stated that "[i]t's bipolar, manic, tomonic (phonetic), and hianzitis (phonetic)."

[3]The Notice of Award stated:

> If you work full-time or part-time and make $65 or less each month, your SSI will usually not change. As the money you earn from your job goes up, your SSI will go down. However, if you have no other income (money or support), you can earn up to $1,052.99 a month and still get at least $1 in SSI.

[4]Mr. Dobbs was represented by an attorney during the original divorce and first modification proceeding. He has, however, been unrepresented ever since the 1997 proceeding.

for "prescription fraud" and that she had pawned her automobile in order to make bail. At the conclusion of the hearing, the trial judge ruled from the bench as follows:

> I am not going to grant her petition. I've had an opportunity to see Ms. Dobbs, and I think that she can obtain some employment. I'm not so sure that this disability thing is not an error, and I think Social Security ought to re-think her case and make sure that she's not drawing it when she shouldn't be.
>
>          \*        \*        \*
>
> So I want the order to reflect that I'm not going to grant her petition. I think she's underemployed and I think the disability matter – where she's drawing SSI – needs to be reviewed, and I will so order a review to make sure that she is drawing under this program appropriately, so if you'll put that in the order.

The trial court also provided Mr. Dobbs with one of the IV-D contractor's pamphlets in order to enable him to obtain assistance in collecting child support from Ms. Norfleet. On March 31, 1998, the trial court entered an order finding "that the Petitioner is receiving SSI benefits but . . . that the Petitioner is able to work and is not disabled." The trial court also stated "that the State of Tennessee should investigate the Petitioner's claim of disability to determine whether her SSI disability should be terminated." The State, through the Attorney General and Reporter, has perfected this appeal on Ms. Norfleet's behalf.

## II.

This case comes to us in a unique posture. While it is not unusual for the Attorney General and Reporter to appear in this court on behalf of custodial parents who are seeking assistance in collecting child support under the IV-D program, this is the first appeal in which the Attorney General and Reporter has appeared before us to advocate decreasing a noncustodial parent's child support obligation. Because the father is unrepresented and because no party before the court appeared to be advocating the best interests of the children, we invited the Attorney General and Reporter to enlighten us concerning his role in this proceeding. The Attorney General and Reporter has provided us with a supplemental brief asserting that his conduct, and that of the IV-D contractor, is consistent with the IV-D program. He has also suggested that we should not inquire into these matters because they are beyond

the scope of this appeal. We respectfully disagree. The best interests of minor children whose parents are before the court are properly our concern.

In 1974 the Congress enacted the IV-D program to provide the states with financial incentives to improve their laws and programs to collect child support from noncustodial parents. The program's major premises were that the rapid increase in AFDC spending were, to a great extent, caused by the failure of noncustodial parents to support their children[5] and that the rate of growth of federal spending could be moderated if the states collected child support more aggressively. Thus, the IV-D program required the states to provide custodial parents with legal assistance in collecting child support from noncustodial parents.[6] The General Assembly responded in 1977[7] and again in 1982[8] by enacting statutes empowering the State to provide child support collection assistance not only to custodial parents receiving AFDC support but also to custodial parents who are not. *See* Tenn. Code Ann. § 71-3-124 (Supp. 1998); *Baker v. State ex rel. Baker*, No. 01A01-9509-CV-00428, 1997 WL 749452, at *3 (Tenn. Ct. App. Dec. 5, 1997) (No Tenn. R. App. P. 11 application filed).

When the Congress enacted the Family Support Act of 1988[9], it included a provision requiring the states to enact laws providing for two types of review of child support orders being enforced under the IV-D program. The first type of review is a periodic review . *See* 42 U.S.C.A. § 666(a)(10)(A) (West Supp. 1998). This type of review is automatic and envisions updating child support awards enforced by the IV-D program without requiring proof of a substantial change in circumstances. *See* 42 U.S.C.A. § 666(a)(10)(A)(iii). The second type of review is a review initiated at the request of either parent. *See* 42 U.S.C.A. § 666(a)(10)(B). Under this procedure, modifications to an existing child support obligation will not be made if the requesting party fails to demonstrate a substantial change in circumstances.

---

[5]*See* S. Rep. No. 93-1356 (1974), *reprinted in* 1974 U.S.C.C.A.N. 8133, 8145.

[6]*See* 42 U.S.C.A. § 654(4)(B)(ii) (West Supp. 1998); S. Rep. No. 93-1356, *reprinted in* 1974 U.S.C.C.A.N. at 8158.

[7]*See* Act of May 4, 1977, ch. 235, 1977 Tenn. Pub. Acts 566.

[8]*See* Act of Apr. 6, 1982, ch. 764, 1982 Tenn. Pub. Acts 372.

[9]*See* Family Support Act of 1988, Pub. L. No. 100-485, 102 Stat. 2343 (1988).

The Secretary of Health and Human Services later promulgated regulations to implement the review procedures required by the Family Support Act of 1988. These regulations provide that IV-D agencies must "[p]eriodically review and adjust child support orders, as appropriate, in accordance with § 303.8." 45 C.F.R. § 303.4 (1998). They define an "adjustment" as "[a]n upward or downward change in the amount of child support based upon an application of State guidelines for setting and adjusting child support awards." 45 C.F.R. § 303.8(a)(1)(I). They also define "review" to include "an objective evaluation, conducted through a proceeding before a court . . . of information necessary for application of the State's guidelines for support." 45 C.F.R. § 303.8(a)(3). In addition, the regulations require IV-D agencies to notify obligor parents of their right to request a review of their child support order. *See* 45 C.F.R. § 303.8(c)(2).

One of the original premises of the IV-D program was that aggressively pursuing child support from a noncustodial parent was in a child's best interests. It is for this reason that the IV-D program requires states to provide assistance to custodial parents who are attempting to collect child support from noncustodial parents. The Secretary's regulations, promulgated in response to the Family Support Act of 1988, introduce the seemingly anomalous notion that it might also be in a child's best interests to decrease the amount of support received by a noncustodial parent. While the regulations themselves do not elucidate how the Secretary arrived at this conclusion, an Information Memorandum issued by the Office of Child Support Enforcement explains that

> In some cases, a downward adjustment may even be advantageous to the child if it results in an amount of support which can be paid fully, regularly, and timely by the obligor. An unrealistic order, which is inconsistent with the guidelines and the obligor's ability to pay, may result in only sporadic payments or none whatsoever.

The Role of the IV-D Agency and Its Staff in Delivering Program Services, OCSE-IM-93-03 (July 23, 1993).

This proceeding does not require us to review or endorse the Secretary's conclusion that decreasing the amount of child support may, in some instances, be in the child's best interests. We cite these federal materials only to make clear that federal law does, in fact, empower lawyers furnished by IV-D agencies or contractors to assist non-custodial parents who are seeking to decrease the amount of their child

support obligation.[10]  Thus, for the purposes of this case, the lawyer furnished by Nashville's IV-D agency could properly appear in the trial court to advocate decreasing Ms. Norfleet's child support.  Because this lawyer was technically representing the State, *see* Tenn. Code Ann. § 71-3-124(d) (Supp. 1998), the Attorney General and Reporter may likewise pursue this appeal by virtue of his authority to represent the State in all civil litigated matters.  *See* Tenn. Code Ann. § 8-6-109(b)(1) (1993).

Concluding that lawyers furnished by a IV-D agency or contractor may assist noncustodial parents who are seeking to decrease their child support does not end the matter.  Serious conflict of interest concerns arise when government-provided lawyers advocate decreasing child support.  Courts, discharging their parens patriae responsibility to children of divorced parents,[11] should satisfy themselves in these circumstances that the interests of the child are being adequately represented.  They may reasonably conclude, in absence of evidence to the contrary, that a lawyer advocating a decrease in the noncustodial parent's child support obligation is not necessarily representing the best interests of the child.  They may also take steps to satisfy themselves that the custodial parent is able to represent the child's best interests.

In circumstances such as this case, where the custodial parent desires, but does not have the financial means, to retain counsel to assist in opposing a request to decrease child support, the court may appropriately take steps to aid the custodial parent in seeking legal assistance.  Under both state and federal law, the custodial parent is entitled to request assistance from the IV-D agency or contractor.  However, when the IV-D agency or contractor is already furnishing legal assistance to the noncustodial parent, it may be unable or unwilling to provide legal assistance to the custodial parent.  If the IV-D agency or contractor undertakes to provide legal assistance to the custodial parent, the trial court should satisfy itself that no ethical conflict has arisen by permitting lawyers furnished by the same IV-D agency or

---

[10]Federal law does not require IV-D agencies or contractors to provide assistance to all noncustodial parents seeking to decrease their child support.  They are permitted to make an independent decision that a noncustodial parent has a meritorious claim for reduction of child support before agreeing to provide assistance.

[11]*See Smith v. Smith*, 188 Tenn. 430, 437-38, 220 S.W.2d 627, 630 (1949); *Rubin v. Kirshner*, 948 S.W.2d 742, 747 (Tenn. Ct. App. 1997).

contractor to assert conflicting positions in the same proceeding.[12] If the IV-D agency or contractor declines to provide legal assistance to the custodial parent or if the court determines that the manner in which the IV-D agency or contractor has chosen to provide legal assistance creates a conflict of interest, the court may appoint a lawyer to assist the custodial parent and may order that the lawyer's fee be paid from funds administered by the IV-D agency or contractor. The court should not appoint a lawyer to assist the custodial parent until it has satisfied itself that the custodial parent has a colorable claim for child support or a colorable defense to the noncustodial parent's request for modification of an existing child support order.

As far as this record shows, Mr. Dobbs had not, prior to the November 20, 1997 hearing, requested the IV-D contractor to assist him in collecting the child support arrearage owed by Ms. Norfleet or in defending her request for reduction in her child support. Even though the trial court provided him with information concerning how to seek this assistance at the conclusion of the hearing, Mr. Dobbs did not make an appearance in this court, and the record contains no indication that he sought assistance for this appeal. Because we have determined that this case may properly be submitted for decision under Tenn. R. App. P. 29(c), we need not consider whether Mr. Dobbs is entitled to counsel for this appeal.

## III.

Ms. Norfleet raises only one issue on this appeal. She asserts that the trial court's denial of her motion to modify her child support obligation is contrary to the child support guidelines because she will be required to use her SSI payments to pay her child support. We have concluded that Ms. Norfleet has misconstrued both the trial court's order and the child support guidelines.

---

[12]The Board of Professional Responsibility has issued a formal ethics opinion concluding that attorneys furnished by IV-D agencies or contractors may appear in later proceedings to advocate modifying a child support award even though they had previously assisted in establishing the award for the other parent. *See* Board of Professional Responsibility, Formal Op. 90-F-123 (Sept. 14, 1990). This case involves a different circumstance. The question here is not whether a lawyer furnished by a IV-D agency or contractor can assert different interests in two proceedings, but rather whether a lawyer or lawyers furnished by the same IV-D agency or contractor may assert different interests in the same proceeding.

The child support guidelines clearly state that the courts may not include in their calculation of a noncustodial parent's gross income benefits the parent is receiving from "means-tested public assistance programs . . . such as . . . Supplemental Security Income (SSI)." Tenn.Comp. R. & Regs. r. 1240-2-4-.03(3)(c) (1994). However, the child support guidelines also state with equal clarity that

> If an obligor is willfully and voluntarily unemployed
> or underemployed, child support shall be calculated based
> on a determination of potential income, as evidenced by
> educational level and/or previous work experience.

Tenn. Comp. R. & Regs. r. 1240-2-4-.03(3)(d). In this case, the trial court did not use Ms. Norfleet's SSI payments to calculate the amount of her child support. Rather, the trial court simply concluded, based on the proof and its opportunity to view Ms. Norfleet in court, that Ms. Norfleet was willfully unemployed and that she was capable of earning $68.25 per week to enable her to pay her child support.

The trial court's conclusion that Ms. Norfleet was able to do some work and that she was voluntarily unemployed is not inconsistent with the Social Security Administration's decision nine months earlier that Ms. Norfleet was entitled to SSI benefits. The Social Security Administration did not conclude that Ms. Norfleet was unable to perform any work, and in fact, it specifically informed Ms. Norfleet that she could work either full-time or part-time and still receive a prorated portion of the SSI payments as long as she did not earn more than $1,052.99 per month. Thus, the mere fact that Ms. Norfleet was receiving SSI payments did not prevent the trial court from concluding that she was voluntarily unemployed.

At the November 20, 1997 hearing, Ms. Norfleet had the burden of proving that there had been a substantial change in her circumstances and that she was unable to earn sufficient income to enable her to meet her current child support obligation. While she may have proved that she was no longer living with her boyfriend and that her mother had declined to loan her anymore money, she failed to satisfy the trial court that she was so disabled that she was unable to perform any sort of work. Based on the record before us, we have no basis to conclude that the evidence preponderates against the trial court's conclusion that Ms. Norfleet is voluntarily unemployed.

**IV.**

We affirm the order denying Ms. Norfleet's request to modify her child support obligation. We remand the case to the trial court for further proceedings consistent with this opinion and for the entry of an order directing the State to provide the Nashville District Office of the Social Security Administration with a copy of the trial court's March 31, 1998 order. We tax the costs of this appeal to Kimberly Ann Norfleet for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE


CONCUR:


_____
BEN H. CANTRELL,
PRESIDING JUDGE, M.S.


_____
PATRICIA J. COTTRELL, JUDGE